May it please the court, I'm Joe Leone, DeWitt, Ross, and Stevens, representing the appellant Lon Berndt of Berlon Industries. We are not asking the court to weigh the sufficiency of the evidence below. What we are asking is the court to reverse the decision below because there was no objective evidence as to the 987 patent to support the jury's verdict that the public use of that silage cutter was an experimental use. Did you file a ruling on it? We did not. There was no Rule 50 motion filed. Either before or after the jury's determination? At no point in the trial was a Rule 50 motion filed. Was there any procedural default in your court? No. The Rule 59 motion was filed. So we would ask, at a minimum, a remand or a new trial. So I think procedurally we're properly before this court. If the J-Law was not filed after the jury determination was made, then the entire aspects of the jury findings are correct. You can't challenge the jury findings. This court cannot weigh the sufficiency of the evidence that was presented. But if there was no objective evidence to support the jury's verdict, this court is within its power to grant us a new trial or even to reverse the finding below if there was no evidence to support the jury's findings. Do you have to weigh the sufficiency of the evidence at that point? No. If no evidence was submitted, there's nothing to put in the balance at that point. There was no objective evidence submitted at any point in the trial to support the jury's verdict that the public use was experimental. This court's precedent has said, and opposing counsel will make much of it, that there are two issues from the electromotive case. Control of the device and the potential customer's awareness that the use is experimental. The electromotive case also stood for the proposition that the inventor's own subjective intent of whether or not he was experimenting is irrelevant. Those two factors have to be proven by objective evidence. No, it's not objective evidence because they didn't do anything that a normal person doing an experiment would do. No reports of any sort were kept. The inventor specifically stated that he asked no specific questions of how the experimentation was going. There were no records of any sort, no maintenance records. The machine wasn't even concealed. The machine was given to Fred Kulig, the inventor's neighbor, in an open-ended fashion. He never expected to get the machine back, never asked. He never asked whether or not, as to whether Kulig knew it was for experimentation. There might have been some evidence that Kulig knew, but Kulig wasn't the guy who used the machine. His employees did, and the record below is completely devoid of any evidence of any sort that the guys who actually used that machine had any idea that its use was for experimentation. Going in from a different direction, if you look at the evidence that was presented, it's overwhelming that the public use, which was stipulated, was not experimental. Again, no notes or notebooks were kept. No maintenance logs were kept. No records were kept of who could use the machine. No records were kept of who actually used the machine. No records were kept of who might have seen it in operation. It was on one farm, but a lot of public people came to that farm. I mean, it was a 150-head farm. The record notes that a whole slew of people, veterinarians, milk guys, all the people who would come to a normal, large... This is a commercial operation. It might be a farm, but it's not a mom-and-pop shop. Public use counts if you use it without the objective evidence of control. Control and the customer awareness are the two critical factors that this court articulated were absolutely critical to proving the experimental use exception. And in this instance, again, I'm not asking the court that it weigh the sufficiency of the evidence. Our point is that no evidence was submitted below to support the jury's verdict on this particular issue as to the 987 patent. So you want a new trial? We would love a new trial. We would like even more if we were to simply reverse and send this back. Send it back for a new trial? On the other remaining issues, there's two patents at play. So as to the 987 patent, we would ask that this court hold it invalid for a bar in public use. Any alternative, we would like a new trial. On that issue? Yes, ma'am. Additionally, the device itself, when it was given to Fred Kulig from day one, that device is the exact same device that's recited in the 987 patent. So this court has held in the past that if you experiment to items that aren't recited in the claims, that's not experimentation. So that's EZDoc and Electromotive as well. Experimental use doesn't apply to experiments that are performed to non-claimed elements of the invention. So if you look at the invention as claimed in the 987 patent, it's identical. If you look at it element by element, it's identical to the device that Slobby dropped off at Kulig's farm on day one. So whatever they were doing with that device, it wasn't experimentation because the device at day one was the device as it's claimed in the 987 patent. Nothing was changed. What's the difference between the two patents? They're very, very similar. The first one, it's a silage cutter with a rotating wheel. It has a series of teeth that stick out this way. So as it goes around. The later patent, which issued... Are they both affected in the same way, similarly, by the issue that you're afraid of experimental use? No. I don't think we can make that argument because, one, it wasn't part of the JMOL, or rather the Rule 59 motion. But the experimental use ended at some point, the first patent issue, and then it was another eight years before the second patent issue. I'm not sure we can make that point because the patent office considered the 987 patent when it granted the later 322 patent. So no, from our perspective, we are only raising the experimental use with respect to the 987 patent. We've also raised... If I could move on, if you have any other questions. So we also raised issues about obviousness and addressing the 987 patent first. Again, at the trial... Judge's... Judge's final disposition. It was on the... The motion for a new trial. It was on the experimental use issue, not obviousness, wasn't it? That is correct. So why is that before us? I raised it. I believe it's within this court's purview that even in the absence of a Rule 59 motion, we have the inherent power to rehear my case at a heightened level of review. I'll grant that. So at trial, inventor Slobby admitted on the record that the TPUs and the 987 patent were publicly available. They were commercially available. He bought them. In the appendix, A893 and A897 is a picture of a device, a Fox silage cutter. It's very similar. It has a rotating reel. That device was... There was a corresponding patent that was considered in the application that matured in the 987 patent, with one exception. The Williamson patent, which was submitted to the PTO, did not have teeth extending tangentially from the reel. But the Fox manual, which as you can see sideways, A893, clearly shows teeth extending tangentially from that reel. To arrive at the claimed device, simply take the teeth that Slobby bought off the shelf and put them into the Fox device, and you have a device that is, if not anticipating, it certainly renders obvious the device claimed in the 987 patent. But you're requiring us to re-weigh the evidence that's been presented at trials, correct? Again, I'm not asking you to re-weigh it. It is what it is. That was elicited at trial. The device, as a matter of law, the device, it is what it is. The teeth were commercially available, and the Fox device is out there. Are you arguing for a new trial based on that? Yes. Yes, sir. As to the 322 patent, which was issued eight years later, again, the devices are extremely similar. The later device has curved teeth rather than flat teeth. But again, if you look at the appendix, at A887 is a picture of teeth used in other silage-removing devices that show a curved, hooked blade. So we would argue that that was submitted, and clearly renders obvious the device was cited in the 322 patent, as a matter of law. Mr. Adrian Rabato-Conner? Yes, please. Thank you. Mr. Leone says no evidence. Well, we'll talk about the experimental use, because regardless of counsel's protestations that he's not asking this court to waive the evidence, that's exactly what he's doing here. Well, of course, he's right that there's no evidence. There's no way. Right, well, we do disagree with that. Let's talk about the inventor control. He says two of the electromotive factors are controlling here. No inventor control, and the fact that the quote-unquote customer had no knowledge of the experimentation. If we look at the control, the testimony that they referred to on that is a citation, and it's found at A254, where Mr. Slobby was asked, would you ever talk to the hired health about how the thing was working? And the answer that is set forth in Burns' brief was, not anything specific, no. Well, the actual quote there, that was truncated. The actual quotation was, not anything specific, no. I asked them how the machine works, and they said, well, and then there was an objection on hearsay. No part of that was ordered stricken, of that answer, so we know that he had asked them about how the machine works. In addition, they choose to ignore other parallel testimony that proves the same thing. If we go to the transcript at A300 to A301, we asked Mr. Slobby, how often were you there? Or when you were there, would you talk to Kulik or his employees about how the machine was operating? He said, that seemed to be the topic every time I went over there. We talked about the break or breaking, things like that. How often were you there? Once a week for sure. And were there times when you were there more? Sure. So we've got testimony in the record where Mr. Slobby is going over there asking about what's happening. Now, the interesting thing about this machine, it's only operated five to seven minutes twice a day, and that would correspond with the feeding schedules for the bulldog. So that in the course of a week, you've got maybe an hour, hour and a half worth of use. Mr. Slobby is there once or twice a week, and we know one of three things happened. Either he operated the machine, he observed it in operation by Mr. Kulik's employees, or he asked them how it was going, what was working. The other thing we know is that when it was broken, he's the only person that fixed it. And if he wasn't there at the time it broke, they called him and said, you've got to come over and fix it. Well, that could be warranty service. But it wasn't sold. There's no evidence here that there was any commercial activity whatsoever. This was a neighbor-being-neighbor. Mr. Kulik knew that Mr. Slobby didn't have a bunker silo. Well, doesn't that cut against the term neighbor-being-neighborly? It doesn't sound like a vignette he used to test and feedback to me so I can approve it. Well, no, because the testimony in the record here from Mr. Slobby was he created this thing. Mr. Kulik knew that he was making it while it was in production. And when it was done, he said, can I bring it over and test it? And Mr. Kulik said, sure. Now, they took the discovery deposition of Mr. Kulik, and he didn't say anything different. Mr. Kulik wasn't called to testify. Is that language, actual testimony, can I bring it over to test it? Yes, Mr. Slobby testified to this. It's referenced in your brief. The other thing is, they're arguing here that there is no evidence of experimental use. Well, let's look at the other electromotive factors. The necessity for public testing. This was a situation where you needed a bunker silo, which are 20 or 30 feet wide, 20 feet deep, 6 or 8 feet high, filled with silos to test this thing. It wasn't practical to build something like that indoors. The other thing was, this attachment went on a skid steer, which is operated by diesel. And this was all evidence before the trip? Absolutely. It was presented at trial? Yes, sir. Yes, sir. It's all part of the reckoning then? Yes, sir. You couldn't test this thing indoors because of the fumes and everything else and the impracticality of building it there. We talked about the amount of control over the experiment retained by the inventor. The nature of the invention. The length of the test period. As I said, this thing was only operated several minutes each day. So the fact that you had a test period that went from—the test period actually was about a year. The pre-critical date of use was about seven or eight months. So the testing actually continued after the critical date. Let's go back to control again. Yes, sir. What's the control? Do you use it this way? Do you use it that way? What was the evidence of control? The evidence of control was, we're going to bring it over. Only Mr. Kulig and his employees are going to use it. There weren't going to be any public displays of this thing. And it wasn't to be removed from the farm. The other thing was, he was asked—Mr. Slavy was asked on cross-examination whether or not he told anybody to put a tarp over it when it wasn't in use. And he said no, he didn't. But this thing would be taken off and put on the skid-steer loader, and it was kept near the entrance to the bunker silo. And the testimony is uncontroverted. And the trial court, in its opinion, found that when these people—if somebody wandered into the farm, onto the farm, this was not readily observable. It was something they had to go hunt and look for. So the casual invitee to the farm, whether it was a vet or anybody else, wouldn't see the thing. There's no testimony here that any payment was made. Kulig didn't buy it. He wasn't requested to pay for it. Mr. Slavy didn't pay him to bring it over there. Records of the experiment. We've got adjacent farms here. Mr. Slavy's the only one that does any improvements. He's the only one that does repairs. He's over there once or twice a week. He either observes it or asks how it's going. And it's just not practical in those situations to have anybody write records. I mean, they've got 150 dairy cows or however many they had. The hired helper probably doesn't have time to sit down and write a log, as a practical matter. And Slavy was there. He was the only one that had any control over the repairs. No commercial exploitation during the testing period. Undisputed. Again, the invention required evaluation under conditions of actual use. This thing had to be tested not only as to whether it would cut silage properly, but do it during different times of the year. Because the silage was exposed, and during the winter this thing would freeze hard as a rock. And Mr. Slavy talked about he had a lighter gauge blade in there initially, and when they put it on the frozen silage, it would break. They would deflect. They had to make it heavier. So this was all testing that went to a claimed element. The testing was systematically performed. It was used on a regular basis throughout this test period. It was monitored. And there was no marketing activity of any kind. This thing wasn't offered for sale for several years after the testing ended. So there was no commercial activity at all during the test period. Obviousness, again, I think going back here. There was no J-Law motion. There was no Rule 59 motion. They've got to show prejudicial legal error in the conduct of the trial, and none has been put forth here. Not on the audits. It's just on the experimental use. You know, there has been... Yes, sir. There has been no prejudicial legal error argued or put forth. You know, I wasn't able to call this witness. I couldn't put this evidence in. I couldn't put this testimony on. The judge did something to taint the jury. There has been no argument about that. So I think what we've got here is a situation where they want a second kick at the cat. They want this court to come in and reweigh the evidence, do the jury's job, even though the trial court, and even on the Rule 59 motion on the experimental use, the court found that not only the proof had been offered of the factual basis to support the objective factors intellectual motive, but the court concluded that far from being unreasonable, the jury's determination that the use was experimental was overwhelmingly supported by the evidence. And there was a trial court that was there for the trial, heard the witnesses, and heard the testimony. They said the evidence was consistent that the only purpose for using the prototype silage cutter at Coolick's Farm was to test and improve it. So the trial court was satisfied. There has been no prejudicial legal error shown, and I submit that the motion for a new trial in front of this court should be denied. Thank you. Mr. Hopkins, Mr. Leon has five minutes or so. Thank you. Mr. Hopkins raises a number of issues that I don't think are relevant here. He talks about a conversation, what did they talk about? Mr. Hopkins mentions a brake. A brake is not a claimed element of a device, so cannot form the basis for his experimental use defense. Coolick operated a commercial operation. His very use of the device was to his benefit. The silage wasn't thrown away. The silage was fed to Coolick's cows. He literally gave this device to a commercial operation. He was a potential customer. I don't know if he ever became an actual customer. The record is still devoid that any conversation… That's important, isn't it? One customer, and we're not sure that he ever became even he. No, I don't think that's critical because the case law says both customers and potential customers have to be aware that the use is experimental, and Coolick's employees, who were the people who used that machine most, there's zero evidence on the record, none whatsoever, that they were told that that use was experimental. Each of those gentlemen who used that machine were potential customers, and that is fatal. Labonte says if you fail to tell the guy who uses your machine that it's for an experimental use, that failure is fatal to the experimental use exemption. Mr. Hopkins' reading of the trial record is inaccurate. He intimates to this court that only Coolick or his employees were allowed to use that device. That is simply not true. Question. Did you have any restrictions on who could operate that machine? Answer from Mr. Slobby. No, I didn't. Question. My question was, was it, the silage cover, at all concealed while on the Coolick farm? Answer. Was it concealed? As far as throwing a tarp over it or something such? No. Question. I'm not talking about crowds of people. I'm just saying if any of these third parties, and then an open bracket, see, machinery salesmen, nutritionists, milk pickup men, milk inspectors, etc., arrived on Coolick's farm, was he, Coolick, under instruction from you, don't show this to anybody? Answer. No. This device was given to Mr. Coolick with zero control and open-ended. He was never asked to return. He wasn't instructed who could use it, when they could use it. Period. There is no evidence, objective evidence, on this record that Slobby exercised the requisite control to make this public use an experimental use. Thank you. Thank you, Mr. Neal. All rise.